Helen HERBERT, as Administratrix of the Estate of Charles R. Herbert, Sr., Deceased, Appellant

v.

PARKVIEW HOSPITAL a/k/a Allegheny University Hospital, Parkview, Paul M. Miller, D.O., William A. Nickey, D.O., and Elizabeth Shandor, D.O., Appellees.

Helen Herbert, as Administratrix of the Estate of Charles R. Herbert, Sr., Deceased,

v.

Parkview Hospital a/k/a Allegheny University Hospital, Parkview, Paul M. Miller, D.O., William A. Nickey, D.O., and Elizabeth Shandor, D.O.,

Appeal of: William A. Nickey, D.O.

Superior Court of Pennsylvania.

Argued April 22, 2004.

Filed July 22, 2004.

Derek R. Layser, Philadelphia, for Herbert.

Gary M. Samms, Philadelphia, for Nickey.

Before: JOYCE, BOWES and JOHNSON, JJ.

JOHNSON, J.

¶ 1 In this case, we are presented with cross-appeals from the trial court's denial of post-trial motions following a medical malpractice proceeding in which a jury awarded Helen Herbert, as Administratrix of the Estate of Charles R. Herbert, Sr. (respectively, Administratrix and Dece-

dent), $140,399 allocated as follows: 60% responsibility to Parkview Hospital; 30% responsibility to treating physician Elizabeth Shandor, D.O.; and 10% responsibility to treating physician William A. Nickey, D.O. Parkview Hospital and Dr. Shandor agreed to an approved joint tortfeasors release for consideration in excess of the damages assessed by the jury prior to trial, thus the only contested liability at trial was that of Dr. Nickey. Following trial, Administratrix challenged by post-trial motion the trial court's inclusion of Parkview Hospital and Dr. Shandor as parties-defendant on the jury verdict sheet, and argued that for want of expert testimony as to settling defendants' liability, the jury lacked any basis on which to apportion liability. Dr. Nickey, by post-trial motion, contested the qualification of Administratrix's expert on the appropriate standard of care under the Medical Care and Reduction of Error (MCARE) Act, 40 P.S. §§ 1303.101, *et seq.* Finding no trial court error on these issues, we affirm.

¶ 2 The facts underlying this case are not subject to dispute material to this appeal, thus we rely on the trial court's account.

On May 8, 1999, [Decedent], then age 73, was taken by fire rescue to the Emergency Room at Parkview Hospital. According to the ER physician's record, a history was taken and it was noted that [Decedent] was "breathing funny." The admissions note indicates that [Administratrix] found [Decedent] on the floor in the kitchen, and he was breathing heavy. After being evaluated in the Emergency Room, [Decedent] was admitted to the Parkview ICU. The nurse's note indicates he was put in wrist restraints upon admission to the ICU because he was grasping at his throat and appeared to be having trouble breathing.

On Sunday, May 9, 1999, [Decedent's] nephrologist, Defendant Dr. Nickey, was called in to see [Decedent] in order to prepare for inpatient dialysis treatment. [Decedent], an end-stage renal failure patient, had been in Dr. Nickey's care for this disease for some period of time. Dr. Nickey did not examine [Decedent's] mouth and throat because he understood he was there solely to consult about dialysis.

On May 10, 1999, [Decedent] underwent an emergency intubation. A large piece of steak was found in his throat and was removed. However, [Decedent] developed an infection, his condition deteriorated, and after being transferred to Albert Einstein Medical Center, he died on May 18, 1999.

Trial Court Opinion (T.C.O.), 12/17/03, at 1–2.

¶ 3 Before trial began, defendant Paul M. Miller, D.O., was dismissed from the case. Also prior to trial, Administratrix entered into a joint tortfeasor release agreement (Release) with all remaining defendants except Dr. Nickey. Under that Release, Administratrix, in consideration for $185,000, released all defendants except Dr. Nickey from further action arising from this claim. The Release provided that "if it should be determined that [Dr. Nickey] is joint[ly] or severally liable to the plaintiffs with any person or entity herein released, ... the claim against and damages recoverable from [Dr. Nickey] *shall be* reduced only by the amount determined by the sum of the pro-rata share of legal responsibility or legal liability for which the parties herein released are found to be liable ...." Release, 6/15/02, ¶ 3 (emphasis in original). The Release also expressly noted the intent of the parties that the "Release shall comply with and be interpreted in accordance with the Uniform Contribution Among Joint Tort-feasors Act as enacted and amended in Pennsylvania." Release, 6/15/02, ¶ 3.

¶ 4 Administratrix proceeded to trial against Dr. Nickey alone. The jury returned a verdict in favor of Administratrix in the amount of $140,399, with only 10% of the responsibility allocated to Dr. Nickey. Following this verdict, Administratrix and Dr. Nickey filed post-trial motions. Administratrix contended that the trial court erred in including the names of the parties to the Release on the jury verdict sheet, thus allowing the jury to apportion liability to those defendants who had settled with Administratrix. Dr. Nickey argued that the trial court erred under the terms of Pennsylvania's MCARE Act, 40 P.S. § 1303.512, by permitting Ian Newmark, D.O., to render expert testimony as to the appropriate standard of care. Post-trial motions were denied, and these cross-appeals followed.

¶ 5 We begin our review by addressing Administratrix's lone issue raised on appeal:

> Whether the trial court committed legal error and/or abused its discretion by denying Administratrix's motion for post-trial relief to mold the verdict to a finding of 100% liability against defendant, William Nickey, M.D. [*sic*], or in the alternative to grant a new trial on damages only, where no party admitted evidence as to the causal fault of previously settled defendants, whose names were submitted to the jury for review, and where no party presented expert medical testimony against any of the settled defendants, which is required to substantiate an action in medical negligence[?]

Brief for Administratrix at 4.

¶ 6 "Preliminarily, we note our standard of review concerning a trial court's ruling on a motion for new trial is

as follows[:] This Court will not reverse a trial court's decision regarding the grant or refusal of a new trial absent an abuse of discretion or an error of law." *Yacoub v. Lehigh Valley Med. Assocs.*, 805 A.2d 579, 586 (Pa.Super.2002). With respect to Administratrix's request in the alternative that the trial court mold the verdict to impose on Dr. Nickey 100% of the total liability assessed, the trial court must afford great deference to the intention of the jury; where the jury's intentions are unclear, the court may not substitute its own judgment. *Gorski v. Smith*, 812 A.2d 683, 708 (Pa.Super.2002). It may, however, order a new trial where the jury's intention is too unclear to discern, thus rendering any attempt to mold the verdict conjectural. *See id.* Although

> a trial court has discretion in deciding whether to mold a verdict, it must nonetheless adhere to the principle that a verdict may only be molded where the intention of the jury is clear. Where the intention of the jury is far from obvious the verdict should be returned to the jury for further deliberations or a new trial should be granted.

*Id.* (internal quotation marks, modifications, and emphasis omitted). Consequently, we review the trial court's refusal to mold the verdict for an abuse of discretion. See *Walsh v. Pa. Gas & Water Co.*, 303 Pa.Super. 52, 449 A.2d 573, 575 (1982). In this case we have no reason to address this exercise of discretion unless we find Administratrix correct that inclusion of Parkview Hospital and Dr. Shandor on the verdict sheet was legally erroneous. Thus, because we find no error or abuse of discretion in the trial court's decision to include those parties on the verdict sheet, we affirm the trial court's rejection of Administratrix's motion to the extent it seeks a molded verdict.

¶ 7 The Uniform Contribution Among Tort-feasors Act (UCTA) provides as follows:

> A release by the injured person of one joint tort-feasor, whether before or after judgment, does not discharge the other tort-feasors unless the release so provides, but reduces the claim against the other tort-feasors in the amount of the consideration paid for the release or in any amount or proportion by which the release provides that the total claim shall be reduced if greater than the consideration paid.

42 Pa.C.S. § 8326. Our Supreme Court addressed the import of comparable language in a predecessor UCTA in the seminal case *Davis v. Miller*, 385 Pa. 348, 123 A.2d 422 (1956). There, following a car accident, passengers in an automobile driven by Richardson sought damages from Miller, driver of the other automobile involved. *See id.* at 423. Miller filed a complaint joining Richardson on grounds that her negligence made her solely or jointly liable. *See id.* Richardson obtained releases of liability from Miller and her passengers pursuant to the UCTA, which releases provided that "any damages, recoverable by the Undersigned [plaintiffs], against or from all the other joint tortfeasors, shall be reduced to the extent of the pro rata share of said damages which the parties released hereby, except for this release, would otherwise have to pay." *Id.* at 424 (quoting the release). The trial court granted Richardson's motion for judgment on the pleadings and discharged her from the case. *See id.* at 423. Miller appealed, asserting that notwithstanding the releases, Richardson should remain in the case in order to permit a jury to determine whether she was jointly liable. *See id.*

¶ 8 The Court reasoned from the UCTA that "an important factor in the determina-

tion of the amount of damages that Miller may be required to pay to plaintiffs is whether or not ... Richardson would also have been liable to them had they not released her,—in other words, whether she was a joint tortfeasor with Miller." *Id.* at 423. If she was jointly liable, Miller would be liable to plaintiffs only for the proportion of the damages awarded at trial that corresponded to his proportionate liability. *See id.* Thus, Miller had "an extremely valuable right in retaining [Richardson] in the case," for purposes of apportionment. *See id.* at 424 "Her continuance in the case [was] ... necessary, even though no recovery [could] be had against her either by plaintiffs or by defendant, in order to determine the amount of damages that [Miller] may be obliged to pay plaintiffs ...." *Id.* The Court consequently reversed the trial court's judgment releasing Richardson from the case. *See id.* More recently, under the present formulation of the UCTA, this Court reaffirmed *Davis* in requiring the continued participation at trial of a settling co-defendant. *See Nat'l Liberty Life Ins. Co. v. Kling P'ship*, 350 Pa.Super. 524, 504 A.2d 1273, 1276–77 (1986) (relying on *Davis*, and citing other cases from our Supreme Court, this Court, and the United States Court of Appeals for the Third Circuit).

¶ 9 Administratrix, however, argues that this Court's decision in *Ball v. Johns–Manville Corp.*, 425 Pa.Super. 369, 625 A.2d 650 (1993), *abrogated on other grounds, Baker v. ACandS*, 562 Pa. 290, 755 A.2d 664 (2000), requires us to reverse because in that case defendants as to whom no evidence had been submitted at trial were found properly excluded from the jury's consideration of liability. Brief for Administratrix as Appellant at 9–13. In *Ball*, plaintiff brought suit against twenty-one defendant asbestos manufacturers alleging that their products caused his illness. *See* 625 A.2d at 652. The trial

court refused to instruct the jury so as to permit apportionment among defendants that had not been named in the complaint, had filed for bankruptcy prior to institution of the lawsuit, had been dismissed on summary judgment, or had settled with the plaintiff prior to submission of the case to a jury. *See id.*

¶ 10 Although this Court's opinion largely upheld the trial court's refusal to submit the various defendants to the jury for apportionment, we reversed as to settling defendants. *See id.* at 661. There, we found "no relevant distinction" between the evidence presented as to the defendants that appeared at trial and those that settled; insofar as it was sufficient as to the former a *fortiori* it was sufficient as to the latter. *See id.* We reversed and remanded for a new trial regarding the causal contribution to plaintiff's illness of the settling defendants. *See id.* at 662. Thus, we agree with Administratrix that, under certain circumstances, a profound lack of evidence regarding settling defendants may preclude the inclusion of those defendants on the jury verdict sheet.

¶ 11 We must consider, however, whether such a deficiency is present in this case. Administratrix contends that a plaintiff, in this case Administratrix, must produce expert testimony demonstrating a breach of the standard of care and proximate causation of the injury in question attributable to the parties, and that no such evidence was adduced at trial. She notes as well that none was required, since Parkview Hospital and Dr. Shandor already had settled and Dr. Nickey asserted no cross-claim against Parkview Hospital or Dr. Shandor. Administratrix cites precedent in support of the evidentiary requirements of medical malpractice claims, and contends that her expert, Dr. Ian Newmark, "testified only as to the deviations from the standards of all physicians when

placed in a situation where family requested a response from a physician who was already treating a patient." Brief for Administratrix (as Appellant) at 19–20. Administratrix's narrow view of Dr. Newmark's testimony does not comport with our review of the record, thus her argument on this point fails. We also note that *National Liberty Life Insurance* undermines Administratrix's secondary argument that, where non-settling defendants have not filed cross-claims against settling defendants, settling defendants should be excluded from the jury verdict sheet. *See* 504 A.2d at 1277–78 ("Cross-claims for contribution are … unnecessary in order to retain the settling defendants as parties to the litigation for the sole purpose of determining the extent, if any, of [non-settling defendant's] right, pursuant to the joint tortfeasor release, to a reduction in any verdict rendered against it after trial . . . .").

¶ 12 Dr. Nickey, in reply to Administratrix's allegations of insufficiency of the evidence against Parkview Hospital and Dr. Shandor, asserts that "the testimony from [Administratrix's] expert and lay witnesses addressed the decedent's entire course of treatment at Parkview." Brief for Dr. Nickey (as Appellee) at 17. Moreover, Dr. Nickey observes, "the trial court permitted [Administratrix] the opportunity during closing arguments to explain the presence of the settling defendants on the verdict sheet to the jury, and persuade them that liability should only have been assessed against Dr. Nickey." Brief for Dr. Nickey (as Appellee) at 17. We agree with Dr. Nickey that the evidence against Parkview Hospital and Dr. Shandor was sufficient to warrant submission of these parties to the jury for apportionment.

¶ 13 This challenge amounts to an assertion that the evidence adduced was insufficient to warrant the jury apportioning any liability to settling defendants Parkview Hospital and Dr. Shandor. Thus, we must determine whether the trial court abused its discretion in implicitly finding sufficient evidence to justify a jury finding that Dr. Shandor and Parkview Hospital were partially liable for Decedent's harm. *See Poleri v. Salkind,* 453 Pa.Super. 159, 683 A.2d 649, 653 (1996). Resolving all conflicts in the evidence in favor of Dr. Nickey, who effectively prevailed on this issue at trial, we must determine whether the elements necessary to support medical malpractice were in evidence prior to submission of this case to the jury. *See id.*

¶ 14 We previously have defined the four elements that a plaintiff must prove to support a claim of medical malpractice:

(1) that the medical practitioner owed a duty to the patient, (2) that the practitioner breached that duty, (3) that that breach was a proximate cause of, or a substantial factor in, bringing about the harm suffered by the patient, and (4) that the damages suffered by the patient were a direct result of the harm.

*Id.*

¶ 15 Administratrix's blunt assertion that *no* qualified evidence was presented to support apportionment of liability to Dr. Shandor for medical malpractice and Parkview Hospital on either a *respondeat superior* or corporate negligence theory cannot withstand scrutiny. Administratrix's own expert, Dr. Newmark, testified more than adequately to a standard of care that, while focused on establishing Dr. Nickey's negligence, cast an equally damning light on the performance of every physician who had a hand in treating Decedent from May 8, when he was admitted to Parkview Hospital, until the piece of steak was found lodged in his throat on May 10.

¶ 16 A few excerpts will explain our ruling on this point. When asked, based on his review of the Parkview hospital

records, whether there were "signs and symptoms recorded in the chart that should have led physicians to consider upper airway obstruction," Dr. Newmark replied, "Yes, there were. There were many signs and symptoms from the time of admission." Notes of Testimony (N.T.), 7/22/03, at 35. Immediately thereafter, Dr. Newmark testified that Dr. Shandor had recorded "the symptom of agitation" on Decedent's chart. The subsequent pages reveal further discussion of another notation Dr. Shandor made in Decedent's chart, and the likely implications of that notation. N.T., 7/22/03, at 35–42. This was followed by Dr. Newmark's crowning observation that "these [notations] in and of itself [*sic*] ... would have been *enough evidence for anybody to suspect strongly that there was a blockage in the airway.*" N.T., 7/22/03, at 42 (emphasis added).

¶ 17 Although Administratrix's argument was not devoid of legal analysis, it relied on her assertion that Dr. Newmark's testimony failed even to *suggest* any misconduct other than Dr. Nickey's. Plainly, the record does not support this claim. Thus, Administratrix's failure to acknowledge the above testimony and other evidence of record, and her consequent failure to explain why such evidence was insufficient to support the jury's apportionment of liability, render her claim meritless. Accordingly, we affirm the trial court's inclusion of the names of settling co-defendants, Parkview Hospital and Dr. Shandor, on the jury verdict sheet, and the jury's apportionment of liability.

¶ 18 Next, we evaluate Dr. Nickey's cross-appeal, in which he raises the following question for our review:

Did the trial court err in permitting [Administratrix's] expert witness, an internist, to testify under section 512 of the MCARE Act regarding the applicable standard of care where the treatment performed by Dr. Nickey solely involved nephrology?

Brief for Dr. Nickey at 4. Like Administratrix, Dr. Nickey requests a new trial, which requires us to follow the deferent standard of review articulated in *Yacoub*. *See* 805 A.2d at 586.

¶ 19 Dr. Nickey argues that the MCARE Act requires Administratrix to present the expert testimony of a nephrologist in order to demonstrate that Dr. Nickey, who treated Decedent in the context of a nephrology consultation, committed malpractice by failing to address and respond to Decedent's airway blockage. The trial court, however, relied on Dr. Nickey's certification and practice in internal medicine, a specialty as to which no one contests Dr. Newmark's qualifications. The trial court observed that Dr. Newmark testified not to Dr. Nickey's failure to abide the standard of care of nephrology; rather, Dr. Newmark's testimony

was offered as a criticism of Dr. Nickey's performance as an internal medicine physician who, while examining the plaintiff for a particular purpose, neglected to apply principles of internal medicine to the symptoms plaintiff was exhibiting and the perceived decline in the plaintiff's medical status between the time of the previous physician's note, at 10:30 am, and Dr. Nickey's examination, at 5:30 pm on the same day.

Memorandum on Post–Trial Motions, 11/26/03, at 5–6.

¶ 20 Our only decision interpreting § 1303.512 is inapposite, *see Wexler v. Hecht*, 847 A.2d 95 (Pa.Super.2004), and its comments as to MCARE are *dictum*. *See id.* at 101 (ruling based on common law; noting that "even if we were to agree with the Dissent with respect to the common law standards for expert witnesses, ... we would hold that Dr. Lazar was unqualified

to render an opinion under the MCARE Act"). Thus, Dr. Nickey's challenge based upon the MCARE Act presents this Court with a question of first impression.

¶ 21 The MCARE provision addressing the qualification of expert witnesses provides, in relevant part:

§ 1303.512. **Expert qualifications**

(a) **General rule.**—No person shall be competent to offer an expert medical opinion in a medical professional liability action against a physician unless that person possesses sufficient education, training, knowledge and experience to provide credible, competent testimony and fulfills the additional qualifications set forth in this section as applicable.

(b) **Medical testimony.**—An expert testifying on a medical matter, including standard of care, risks and alternatives, causation and the nature and extent of the injury, must meet the following qualifications:

(1) Possess an unrestricted physician's license to practice medicine in any state or the District of Columbia.

(2) Be engaged in or retired within the previous five years from active clinical practice or teaching.

Provided, however, the court may waive the requirements of this subsection for an expert on a matter other than the standard of care if the court determines that the expert is otherwise competent to testify about medical or scientific issues by virtue of education, training or experience.

(c) **Standard of care.**—In addition to the requirements set forth in subsections (a) and (b), an expert testifying as to a physician's standard of care also must meet the following qualifications:

(1) Be substantially familiar with the applicable standard of care **for the specific care at issue as of the time of the alleged breach** of the standard of care.

(2) Practice in the same subspecialty as the defendant physician or in a subspecialty which has a substantially similar standard of care **for the specific care at issue** ....

(3) In the event the defendant physician is certified by an approved board, be board certified by the same or a similar approved board ....

40 P.S. § 1303.512 (emphasis added). Thus, on its plain language, the MCARE Act reflects the Legislature's preference for the testimony of expert witnesses who share the relevant area of expertise with the defendant physician. *See id.* § 1303.512(c)(2). The parties do not dispute this.

¶ 22 The instant case, however, turns on the threshold determination as to the area of expertise relevant to the circumstances at bar, which lies at the heart of the parties' disagreement. Dr. Nickey would have us rule that because he was called to treat Decedent in his capacity as a nephrologist, only a nephrologist would have the requisite expertise under the MCARE Act to testify concerning the standard applicable to Dr. Nickey. Administratrix and the trial court, contrariwise, aver that Dr. Newmark's testimony as an expert in internal medicine was appropriate, because, as Dr. Newmark testified, any physician with specialized training and certification in internal medicine, such as Dr. Nickey, should have noted anomalies pertaining to Decedent's behavior, the descriptions to Dr. Nickey by Decedent's family of Decedent's grasping at his neck and other relevant symptoms, and Decedent's own state, and concluded from these

observations that Decedent required immediate attention to the respiratory problems Dr. Newmark testified were manifest. N.T., 7/23/03, at 183 (Dr. Nickey conceding during direct examination that, if informed of patient's throat-related distress by family members of a patient, "I would examine the patient. I would go to the patient. I would enlist the help of nurses or at least enlist—if I didn't know what a throat was, I'd enlist the help of the patient's attending physician who was there that day or responsible for the patient's care in general").

¶ 23 We find that Administratrix's reading of the MCARE Act is correct. *See* 40 P.S. §§ 1303.512(c)(1)-(2) (focusing on the standard of care applicable to *"the specific care at issue as of the time of the alleged breach"* (emphasis added)). We note, as well, that at least one judge on the court of common pleas has adopted an interpretation of the MCARE Act similar to our own. *Cf. Callari v. Rosenwasser*, 63 Pa. D. & C.4th 366, 378 (ruling that, where a neurosurgeon rendering post-operative care discovers and treats an infection, MCARE, 40 P.S. § 1303.512(c)(1), permits the testimony of an infectious disease expert as to the standard of care applicable to a physician who addresses such a condition: "Dr. Cervia, an infectious disease expert, has substantial familiarity with *the applicable standard of care* relating to the treatment and diagnosis of an enteroccocus faecalis infection, including *treatment of that infection given by a neurosurgeon* postoperatively" (emphasis added)).

¶ 24 There can be no question as to the adequacy of Dr. Nickey's background to the task of diagnosing and treating respiratory problems. First, as Dr. Nickey himself testified, internal medicine, in which Dr. Nickey is board certified, entails "the diagnosis of airway obstruction." N.T., 7/21/03, at 125. Moreover, Dr. Nick-

ey testified that in his nephrology practice he sometimes is called upon to treat conditions corollary to the kidney diseases that are the focus of nephrology, including pulmonary disorders such as fluid in the lungs. N.T., 7/21/03, at 123–24.

¶ 25 We also note that this case implicates the novel question of the standard of care generally applicable to specialists called in to consult within their specialties as to patients in critical care. Dr. Newmark, certified in internal medicine, pulmonary diseases, and critical care medicine, N.T., 7/22/03, at 11, testified as follows regarding his qualifications to discuss the standards of care for various physicians in the critical care setting:

Q. When you're in the intensive care unit, do you frequently consult with physicians of other specialties?

A. Yes. It's very routine in an intensive care unit when you have people who are very, very ill and have many medical problems to call in specialists of other specialties. So it would be very routine for me, even though I'm a critical care specialist, to also call in a cardiologist perhaps, a kidney specialist, a diabetes specialist, if that's the particular problem. And, of course, surgeons and anesthesiologists are called in on occasion as well.

Q. Are you familiar with the standard of care for the performance of an examination in an intensive care unit by any physician?

A. Yes, I am.

Q. Are you familiar with the standard of care for the diagnosis and treatment of an airway obstruction?

A. Yes, I am. That's something I deal with routinely.

Q. Are you familiar with the standard of care for the responsibilities of consulting physicians in intensive care unit settings?

A. Yes, I am.

N.T., 7/22/03, at 14–15. Dr. Newmark's assertions about his qualifications to assess the adequacy of a consulting physician's performance in a critical care setting went unchallenged on *voir dire* cross-examination, where Dr. Nickey's counsel focused exclusively on Dr. Newmark's lack of board certification in nephrology.

¶ 26 The MCARE Act plainly prefers, and in some cases may require, that expert testimony in professional medical malpractice cases come from witnesses with expertise in the defendant's particular subspecialty. *See* 40 P.S. § 1303.512(c). We do not read the Act to require, however, that expert testimony in *all* cases must be so restricted. The "same subspecialty" ideal contained in § 1303.512(c)(2) includes an express caveat, reflecting the Legislature's decision to afford the trial court discretion to admit testimony from a doctor with expertise in another specialty that "has a similar standard of care *for the specific care at issue.*" 40 P.S. § 1303.512.(c)(2) (emphasis added). This reading comports with Pennsylvania courts' historical deference to trial courts' discretion in deciding whether to admit evidence at trial and is consistent with the plain language of the statute itself.

¶ 27 Dr. Nickey, a physician whose training and experience in internal medicine is not disputed, encountered a patient that allegedly manifested numerous signs of respiratory blockage and distress. The trial court permitted Dr. Newmark to testify, based on his expertise in internal medicine and critical care, to the standard of care applicable to a physician with internal medicine and critical care experience who encounters a patient under such conditions. We find neither legal error nor an abuse of discretion in the trial court's decision to admit such testimony. Indeed, the wisdom of restricting expert testimony to that of a nephrologist in this case might credibly be questioned, where "the specific care at issue" is the *failure* to provide care in the presence of an allegedly clear respiratory problem the likes of which Dr. Newmark testified should have been obvious to Dr. Nickey.

¶ 28 Given Dr. Nickey's undisputed expertise in internal medicine, as well as in the treatment of pulmonary and respiratory ailments in connection both with his internal medicine and nephrology practices, we find that the trial court acted well within its discretion in determining that Dr. Nickey's testimony was sufficient under the MCARE Act to support a verdict finding Dr. Nickey jointly liable. Consequently, Dr. Nickey's challenge also must fail.

¶ 29 Orders **AFFIRMED.**