Rowena J. GBUR, Executrix of the Estate of Joseph Gbur, Jr., Dec'd. and Rowena J. Gbur, in her Own Right, Appellee

v.

Anthony GOLIO, M.D., Appellant.

Superior Court of Pennsylvania.

Argued April 25, 2007.

Filed Aug. 24, 2007.

Tyler J. Smith, Pittsburgh, for appellant.

Mark J. Homyak, Pittsburgh, for appellee.

BEFORE: McCAFFERY, DANIELS and POPOVICH, JJ.

OPINION BY DANIELS, J.:

¶ 1 This is an appeal, in a medical malpractice case, from an Order entered by the trial court on June 22, 2006, denying Appellant's (Defendant below) Motion for Post–Trial Relief, affirming the jury's verdict in favor of Plaintiffs, and awarding Delay Damages to Plaintiffs pursuant to Pa. R.C.P. 238.

¶ 2 Appellant raises five issues on appeal:

1. Did the trial court err in finding the Appellee's expert witness, a radiation oncologist, was qualified to testify as to the standard of care for a urologist, such as Appellant herein?

2. Did the trial court err in allowing Appellee's expert witness to testify that certain dental treatments were unnecessary?

3. Did the trial court err in allowing Appellee's expert witness to testify beyond the scope of his expert report and to render opinions regarding the results of a bone scan that had been ordered by Appellant?

4. Whether Appellant is entitled to a new trial because the jury's verdict was excessive and not supported by the evidence?

5. Whether Appellant is entitled to a new trial because he was prejudiced by the conduct of the trial judge?

*See* Appellant's Brief, p. 4.

¶ 3 The Opinion of the trial court below succinctly summarizes the facts giving rise to this action as follows:

In a nutshell, this case involves **Golio's** failure to diagnose the metastasis of **Gbur's** prostate cancer; the performance of unnecessary surgery because of the failed diagnosis; and unnecessary dental procedures and attendant pain due to the failure to diagnosis [*sic* ] that the metastasis had spread to **Gbur's** jaw.

## A. FACTS

**Plaintiff, Joseph Gbur, Jr. ("Joseph")** was a 74 year old retired mill worker from PPG Industries in Creighton, Pennsylvania. During his retirement he led an active life, along with his spouse, **Plaintiff, Rowena J. Gbur, ("Rowena")**. He had regular physical examinations by his family doctor. In October 2000, a blood test for prostate screening was performed, and a blood sample from **Joseph** showed elevated

PSA, a possible indication of prostate cancer, and he saw him on October 13, 2000. **Joseph** was referred to Golio, a urologist, who specialized in prostate cancer. At that time **Golio** did a biopsy of his prostate, which showed no evidence of cancer, notwithstanding the elevated PSA. (**N.T. p.813**).[1] Golio advised him to return in six (6) months for further screening.

**Joseph** returned to see **Golio** on March 12, 2001, and his PSA at that time was elevated beyond the level seen in October. He did another biopsy, and ordered a variety of additional diagnostic tests, including a bone scan, and a pelvic MRI. The biopsy showed that **Joseph** did indeed have cancer of the prostate, but **Golio** believed it was encapsulated, that is, had not spread to other parts of his body *i.e.,* there was no metastasis. This information came from a pathologist who examined the tissue and found cancer of the prostate with a Gleason Score of 9 out of a possible total of 10, thus indicating high grade aggressive cancer. (**N.T. p. 817**). **Golio** testified he met with **Gbur** on April 2nd. **Golio,** after receipt of the bone scan and MRI, recommended a treatment of implanting radioactive seeds in **Joseph's** prostate, which might shrink the cancer, and otherwise ameliorate his condition.

## B. THE BONE SCAN

As noted, **Golio** had a bone density test performed on **Joseph,** which would give some indication as to whether any bones had been affected by the cancer. The bone density report dated March 27, 2001, prepared by the radiologist, Dr. Charles Bolden from Alle–Kiski Hospital, clearly stated that "there are

---

1. All references to "N.T." are to the Notes of Testimony from the trial that took place from September 16, 2005 through September 26, 2005.

abnormal areas of activity identified in the right mandible ... consistent with metastasis (N.T. p.189). Gbur's expert, Dr. Shelby Sanford further opined that "consistent with" was the strongest language used by radiologists to say the patient has metastasized cancer. (N.T., p.190).

Notwithstanding the clear meaning of the report, Golio discounted the same, and noted on April 2, on Joseph's file that he had "reviewed with radiology may be inflammatory in light of normal MRI pelvis". (Golio Deposition, p. 34).

On April 4, Joseph had an MRI, also performed by Dr. Bolden, who issued a report indicating that the cancer had not grown through the prostate. (N.T. p.221). Dr. Sanford opined, however, that this report was not inconsistent with the bone scan since this test could not detect blood borne metastatic disease. (N.T. pp.222–223).

Notwithstanding the report suggesting metastasis, Golio continued with the original course of treatment planned, including a surgical procedure to implant the radioactive seeds in which he was assisted by Dr. Victor Onufrey. Another physician, Dr. Jack Abarbanel, was also consulted in Joseph's case, and administered radiation therapy. Golio had also prescribed a medication, Lupron, as additional treatment.

Joseph then began to develop severe dental pain, ultimately determined to be caused by the metastasized cancer in his mandible, which was shown on Dr. Bolden's bone density study, and referenced in his report. Inasmuch as Golio had discounted the Bolden report, neither he, nor any other doctors attributed the dental pain to the cancer in the mandible. Those other doctors relied on Golio's notes as to the diagnosis and none reviewed the actual tests. In short,

none "second guessed" Golio. As a result, Joseph had several root canal procedures, without success, or pain relief, and even insisted that a tooth be pulled in an effort to get relief.

While he was enduring the foregoing dental pain, he continued with the treatment regimen established by Golio.

In December, 2001, because of the ongoing and severe dental pain, Joseph went to the Emergency Room at Alle–Kiski Hospital on November 6, 2001. The time he spent there seemed interminable, and after being there for 6 hours, with little treatment, he left against medical advice. It was later developed by Golio that a Dr. Michel, in the Emergency Room was planning to admit Joseph for a specific test, bone windows, which if done, may have revealed the metastasis. His leaving against medical advice was developed by Golio as evidence of contributory negligence. Apparently, this formed the basis of the jury's finding of 10% comparative negligence. (N.T. pp.532–536). Joseph has not filed any Post Trial Motions excepting to this finding.

Shortly after the Emergency Room visit, Joseph was referred by his Dentist to a Dr. Christopher Martone, who finally diagnosed the cancer in the right mandible as the source of Joseph's pain, and the fact of metastasis, and its fatal consequences to him. Joseph did indeed die from his cancer on January 31, 2004.

Trial Court Opinion, pp. 2–7, Appendix to Appellant's Brief.

¶ 4 Our standard of review in the consideration of a trial court's denial of a motion for a new trial is as follows:

We will reverse a trial court's decision to deny a motion for a new trial only if the trial court abused its discretion. *See Harman v. Borah*, 562 Pa. 455, 756 A.2d

1116, 1121–1122 (Pa.2000). We must review the court's alleged mistake and determine whether the court erred and, if so, whether the error resulted in prejudice necessitating a new trial. *See id.* at 1122–1123. If the alleged mistake concerned an error of law, we will scrutinize for legal error. *See [id.]* at 1123. Once we determine whether an error occurred, we must then determine whether the trial court abused its discretion in ruling on the request for a new trial. *See id.* "An abuse of discretion exists when the trial court has rendered a judgment that is manifestly unreasonable, arbitrary, or capricious, has failed to apply the law, or was motivated by partiality, prejudice, bias, or ill will." *Id.* at 1123.

> *Petrecca v. Allstate Ins. Co.*, 797 A.2d 322, 324 (Pa.Super.2002).

*Stalsitz v. Allentown Hosp.*, 814 A.2d 766, 771 (Pa.Super.2002).

### 1. *Standard of Care*

¶ 5 Appellant first contends that the trial court erred in permitting Appellee's expert, Dr. Shelby Sanford, a radiation oncologist, to testify as to the standard of care and the breach thereof by Appellant, Dr. Golio, a board certified urologist. In that regard, a review of Dr. Sanford's qualifications leads to the inescapable conclusion that the trial court did not err in allowing Dr. Sanford to testify as to the applicable medical standard of care and Appellant's breach of the same in connection with his care and treatment of Appellee's Decedent, Joseph Gbur, Jr.

¶ 6 Dr. Shelby Sanford is an honors graduate from the University of Alabama School of Medicine, where he also served in a radiation-oncology residency program for three years and was the chief resident. He taught for one year immediately thereafter and then went into private practice in June, 1986. He is licensed to practice medicine in Alabama, and he has been Board Certified in radiation oncology since 1986. Since entering private practice in 1986, he has specialized in the field of radiation oncology. He is also the CEO of a cancer treatment center and treats patients with modalities of both chemotherapy and radiation. Radiation oncology consists of evaluating patients who have cancer and administering different types of radiation treatment to such cancer patients. Dr. Sanford has treated between seventeen thousand and twenty thousand new cancer patients in the last twenty to twenty-one years. In the administration of his treatment, he reviews CT scans, MRIs, PET scans, thyroid CT scans and ordinary x-rays. Dr. Sanford's residency included training in Brachytherapy, a procedure using radioactive seed implantation to treat patients with prostate cancer. He did a fellowship with the American Cancer Society, which included training in prostate seed implantation. He also attended special courses involving Brachytherapy on several occasions in both 1995 and 1996. He treats many patients who have medical problems related to the mandible and does so frequently. Between ten percent and twenty percent of his patients have prostate cancer. The treatment of prostate cancer involves the reading of films, interpreting films, and the staging and treatment of prostate cancer patients. Dr. Sanford is a member of numerous medical societies dealing with the medical specialty of radiation oncology, and he has previously been qualified as a medical expert to testify in this field.

¶ 7 Although Dr. Sanford is not a formally trained urologist, he frequently treats patients with an elevated PSA and follows their progress. Dr. Sanford also consults with patients referred to him by urologists for second opinions. He supervises the radiation treatment of forty to

sixty patients daily, and ten to twenty percent of those cases involve prostate cancer patients who are under active treatment by Dr. Sanford. He also regularly works with dentists and oral surgeons in treating patients with cancer of the mandible.

¶ 8 After a rather extensive *voir dire* of Dr. Sanford with respect to his qualifications to testify as an expert in this case, as aforesaid, Appellee's counsel offered him as an expert:

MR. HOMYAK: Your Honor, I offer Dr. Sanford as a physician/expert in regard to the areas of the necessity of reading radiology reports, the appropriate action to be taken by the doctor upon reading the radiology reports, the effect of reading radiology reports in regard to the making of diagnoses and treatment decisions, including referrals to other physicians.

I also offer him as an expert in regard to reading radiological films in those same areas, making decisions regarding treatment, including referrals and diagnosis as well.

I also offer him as an expert in the area of diagnosis, evaluation, staging and treatment of prostate cancer, and finally, in regard to the area of doctors communicating between doctors, with also treating doctors and their patients. (R.R. 904–905).

¶ 9 After Appellant's attorney completed his *voir dire* cross-examination of Dr. Sanford, the following colloquy occurred:

MR. HOMYAK (addressing the Court): Is he [Dr. Sanford] qualified as an expert, Your Honor?

THE COURT: I WILL ACCEPT Dr. Sanford as an expert.

(R.R. 916—Emphasis Added).

¶ 10 The testimony of Dr. Sanford consists of three hundred and sixty-one pages of direct and cross examination. (R.R. 897–1256). Upon our review of such testimony, we have determined that Dr. Sanford consistently limited his expert opinion to Dr. Golio's breach of the minimum standard of care (1) by failing to give any credence to the bone scan which diagnosed cancer of the prostate that had already metastasized to the mandible; (2) by not discussing the bone scan report and its finding with the radiologist who conducted the same and made the diagnosis; (3) by not relating and sharing the results of such bone scan report with Appellee's Decedent's other treating physicians; and (4) by not discussing those results with the patient himself or his family. Such conduct, which, in Dr. Sanford's opinion, was not in conformity with the minimum standard of care required, resulted in unnecessary dental treatment, useless and futile surgery in the implantation of radioactive seeds, and a delay in aggressively treating the cancer of the prostate which had already metastasized to the mandible by the time that the bone scan test was administered. Dr. Sanford further testified that Dr. Golio's pursuit of his original plan of treatment after the date of the bone scan was useless and delayed the appropriate palliative treatment that may have extended the Decedent's life.

¶ 11 While Dr. Sanford's written expert report was never formally offered into evidence, it was referenced extensively by counsel for Appellant in his cross-examination of Dr. Sanford. Thus, upon being asked by Appellant's attorney to read from the written report, Dr. Sanford asked where he should start and was told by Appellant's counsel to start with the words "It is my opinion".

DR. SANFORD (cross): *It is my opinion that Dr. Golio breached the standard of care by not pursuing further evaluation of the positive bone scan*

*findings which in the opinion of the reviewing diagnostic radiologist were most consistent with metastatic disease. The burden fell on Dr. Golio to rule out metastatic disease ...*

*Mr. Gbur was at extreme high risk for potential bone metastasis due to the very high grade of his prostate biopsies,* Gleasons 9, and that the PSA was elevated over 20. *It would have been simple to evaluate these areas with a routine x-ray and/or CT or MRI which would have likely demonstrated the metastatic nature of these radiographic abnormalities.*

...

*The fact that his positive bone scan findings were neither evaluated further nor reported to the other treating physicians resulted in the unnecessarily aggressive treatment of an incurable illness, and at the same time delayed appropriate palliative treatment* with both comprehensive system hormonal therapy that was ultimately instituted by Dr. Lichter and the local palliative treatment to the right mandible that was also arranged by Dr Lichter's department.

(N.T. Trial, 9/20–9/21/05, pp. 466–467—Emphasis Added).

¶ 12 The question of whether Dr. Sanford, a radiation oncologist, was qualified to opine as to the standard of care applicable to and the breach thereof by Appellant, a urologist, is specifically addressed and controlled by the Medical Care Availability and Reduction of Error Act (MCARE Act), 40 P.S. § 1303.512, which provides, in pertinent part:

### § 1303.512. Expert qualifications

(a) **General rule.**—No person shall be competent to offer an expert medical opinion in a medical professional liability action against a physician unless that person possesses suffi-cient education, training, knowledge and experience to provide credible, competent testimony and fulfills the additional qualifications set forth in this section as applicable.

(b) **Medical testimony.**—An expert testifying on a medical matter, including the standard of care, risks and alternatives, causation and the nature and extent of the injury, must meet the following qualifications:

(1) Possess an unrestricted physician's license to practice medicine in any state or the District of Columbia.

(2) Be engaged in or retired within the previous five years from active clinical practice or teaching.

Provided, however, the court may waive the requirements of this subsection for an expert on a matter other than the standard of care if the court determines that the expert is otherwise competent to testify about medical or scientific issues by virtue of education, training or experience.

(c) **Standard of care.**—In addition to the requirements set forth in subsections (a) and (b), *an expert testifying as to a physician's standard of care also must meet the following qualifications:*

(1) *Be substantially familiar with the applicable standard of care for the specific care at issue as of the time of the alleged breach of the standard of care.*

(2) *Practice* in the same subspecialty as the defendant physician or *in a subspecialty which has a substantially similar standard of care for the specific care at issue,* except as provided in subsection (d) or (e).

(3) In the event the defendant physician is certified by an approved board, be board certified by the same or a similar approved board, except as provided in subsection (e).

(d) **Care outside specialty.—*A court may waive the same subspecialty requirement for an expert testifying on the standard of care* for the diagnosis or treatment of a condition *if the court determines that:***

(1) *the expert is trained in the diagnosis or treatment of the condition, as applicable;* and

(2) the defendant physician provided care for that condition and such care was not within the physician's specialty or competence.

(e) **Otherwise adequate training, experience and knowledge.—**A court may waive the same specialty and board certification requirements for an expert testifying as to a standard of care if the court determines that the expert possesses sufficient training, experience and knowledge to provide the testimony as a result of active involvement in or full-time teaching of medicine in the applicable subspecialty or a related field of medicine within the previous five-year time period.[2]

40 Pa.C.S.A. § 1303.512. (Emphasis Added).

¶ 13 In the case at Bar, Appellant relies upon the entire MCARE Act, but primarily upon subsection (d) thereof, relating to "Care outside specialty", in challenging the trial court's ruling. Having reviewed Dr. Sanford's qualifications in excruciating detail, we conclude that such qualifications include his having had significant contact with urologists and, more importantly, in his having actually treated patients with prostate cancer. Moreover, the thrust of Dr. Sanford's testimony did not relate to the substantive field of urology as such, but rather to Appellant's failure to consider and, basically, to ignore the results of the all-important bone scan report's findings, his failure to discuss these findings with the attending radiologist who performed these studies, his failure to communicate those bone scan results and findings to other treating physicians of Appellee's Decedent, and his failure to relate those results and findings to the patient himself and/or to the patient's family.[3] Dr. Sanford, thus, concluded that such failures permitted the prostate cancer to further metastasize to the mandible, delayed the appropriate palliative treatment, subjected Decedent to futile Brachytherapy surgery, caused unnecessary and painful dental treatment and led to Decedent's painful and most unfortunate demise. Since much of his testimony had nothing whatsoever to do with the substantive field of urology, and since Dr. Sanford is eminently qualified to render the opinions that he did, the trial court below was correct in exercising its discretion and in allowing Dr. Sanford to testify as an expert witness. Dr. Sanford did in fact meet the standard required to testify to care outside his own particular specialty under section (d) of the MCARE Act. *See Miller v. Brass Rail Tavern, Inc.*

---

**2.** Act of March 20, 2002, P.L. 154, No. 13 as amended, 40 P.S. §§ 1301.101–1303.910 (the "MCARE Act").

**3.** The bone scan, performed on March 22, 2001, disclosed that:

There are multiple foci of abnormal activity involving the right and left sides of the pelvis, the lower thoracic spine, right ribs, right mandible. *The pattern is consistent with osseous metastatic disease.* There are some areas of increased activity at the knees and in the cervical spine which may be degenerative in nature.

**(R.R. 1805—Emphasis Added).**

541 Pa. 474, 480–481, 664 A.2d 525, 528 (1995). Thus, no error was committed by the trial court in allowing Dr. Sanford's expert opinions as to Appellant's breach of the standard of care in connection with his care and treatment of Appellee's Decedent.[4]

¶ 14 Moreover, this Court has held that the same subspecialty requirement, as referenced in § (c)(1) and (2) of the MCARE Act, may be waived, if, in the discretion of the trial court, the testifying physician has expertise in a subspecialty "which has a substantially similar standard of care for the specific care in at issue". *See Herbert v. Parkview Hospital,* 854 A.2d 1285, 1292 (Pa.Super.2004);[5] *see* also 40 P.S. § 1303.512(c)(1) and (2).

### 2. *Unnecessary Dental Treatment*

■ ¶ 15 Appellant next objects to the trial court's permitting Dr. Sanford to testify as to the unnecessary dental treatment to which Decedent was subjected as a result of the medical advice and the treatment initiated by Appellant, on the ground that Dr. Sanford was not qualified as an expert in the field of dentistry. However, Appellant's own attorney called an expert

4. Recently, the Supreme Court of Pennsylvania, on June 5, 2007, filed an opinion in *Wexler v. Hecht,* —— Pa. ——, 928 A.2d 973, wherein both the majority and dissenting opinions addressed the MCARE Act and the issue of an expert medical witness' qualifications to render an opinion with respect to an appropriate standard of care. However, that case does not address or implicate the issue before us here.

5. As we noted in the *Herbert* case, "[our] reading [of this section of the MCARE Act] comports with Pennsylvania courts' historical deference to trial courts' discretion in deciding whether to admit evidence at trial and is consistent with the plain language of the statute itself." *Id.* 1294.

6. Appellant's attorney, in his case in chief, asked his own expert witness, Dr. Michael Sherry, what effect Decedent's having left the

witness, one Dr. Michael Sherry, in his own case in chief. Dr. Sherry's testimony was exactly the same as that offered by Dr. Sanford, *i.e.*, that the dental treatment would have been unnecessary, had the spread of the cancer been detected in a timely fashion. Thus, Appellant himself placed this very testimony into evidence. Consequently, any possible error claimed has been cured by virtue of the testimony of Appellant's own expert witness, Dr. Sherry. Since Appellant's own witness confirmed Dr. Sanford's testimony, there was absolutely no prejudice to Appellant in the testimony of Dr. Sanford in this regard.[6] **(R.R. 1310–1311).**

### 3. *Scope of Expert Report re: Bone Scan*

■ ¶ 16 Appellant claims that Dr. Sanford's testimony regarding the bone scan test results was beyond the scope of his expert report. This claim is without merit and is totally devoid of any factual foundation. A careful reading of Dr. Sanford's report reveals that Dr. Sanford devoted a significant portion of it to discussing the findings of the bone scan itself. In fact,

hospital against medical advice had on his clinical course thereafter. Dr. Sherry responded, in part:

"Number two, he would never have had six root canals because they were ineffectual.

. . .

They are not going to treat his prostate cancer.

. . .

The root canals would not have been performed.

. . .

I would have said ineffectual for treatment. His pain in retrospect was due to metastatic disease. So he would have gotten radiated sooner. He would not have had root canals. He would not have had Brachytherapy."

**(R.R. 1310–1311).**

the thrust of his report is to the effect that the bone scan clearly showed metastatic disease in the jaw, and that either Appellant failed to review the findings of that bone scan report at all, or clearly failed to consult with the attending radiologist regarding the same, or to communicate the results of the bone scan report to any other of Decedent's treating physicians. (R.R. 9–11).[7]

### 4. *Remittitur*

■ ¶ 17 Appellant next contends that the jury's verdict was excessive and not supported by the evidence. Appellant's Brief, p. 4. The jury returned a verdict in this case of Seven Hundred Sixty–Six Thousand Four Hundred Fourteen Dollars and Ninety–Four Cents in favor of the Estate of Decedent, and in the amount of Seventy–Five Thousand Dollars, in favor of Appellee (Mrs. Gbur), for her loss of consortium. The verdict was then molded to Six Hundred Eighty–Nine Thousand Seven Hundred Seventy–Three Dollars and Forty–Five Cents as to Decedent, and to Sixty–Seven Thousand Five Hundred Dollars as to Appellee. The net verdict for both Plaintiffs was Seven Hundred Sixty–Four Thousand Seven Hundred Seventy–Three Dollars and Forty–Five Cents. Trial Court Opinion, p. 1.

■ ¶ 18 Our standard of review in reversing an order denying a remitittur by a trial court is confined to determining whether there was an abuse of discretion or an error of law committed in such denial. *Smalls v. Pittsburgh–Corning Corp.,* 843 A.2d 410, 414 (Pa.Super.2004).

¶ 19 This Court has discussed in detail the factors to be considered in determining excessiveness:

The grant or refusal of a new trial because of the excessiveness of the verdict

is within the discretion of the trial court. *Hall v. George,* 403 Pa. 563 170 A.2d 367 (1961). This court will not find a verdict excessive unless it is so grossly excessive as to shock our sense of justice. *Kravinsky v. Glover,* 263 Pa. Superior Ct. 8, 396 A.2d 1349 (1979). We begin with the premise that large verdicts are not necessarily excessive verdicts. Each case is unique and dependent on its own special circumstances and a court should apply only those factors which it finds to be relevant in determining whether or not the verdict is excessive. *Mineo v. Tancini,* 349 Pa. Superior Ct. 115, 502 A.2d 1300 (1986). A court may consider the following factors, *inter alia:*

(1) the severity of the injury; (2) whether the plaintiff's injury is manifested by objective physical evidence or whether it is only revealed by the subjective testimony of the plaintiff (and, herein, the court pointed out that where the injury is manifested by broken bones, disfigurement, loss of consciousness, or other objective evidence, the courts have counted this in favor of sustaining a verdict); (3) whether the injury will affect the plaintiff permanently; (4) whether the plaintiff can continue with his or her employment; (5) the size of the plaintiff's out-of-pocket expenses; and (6) the amount plaintiff demanded in the original complaint.

*Kemp. v. Philadelphia Transportation Co.,* 239 Pa. Superior Ct. 379, 361 A.2d 362 (1976).

*Mecca v. Lukasik,* 366 Pa.Super. 149, 530 A.2d 1334, 1340 (1987).

¶ 20 Appellant's principal argument appears to be that Decedent was seventy-six years old and suffering from incurable prostate cancer. This argument is of no legal merit in that the jury was free to accept the argument of Decedent's counsel

---

**7.** See also N.T. Trial, 9/20–9/21/05, pp. 466–467.

(which it clearly did) that if it had not been for Appellant's glaring omission in ignoring the bone scan report, Decedent's cancer might not have further metastasized to the mandible, which caused all of the pain and suffering endured by Decedent, which he might otherwise have avoided. The jury apparently accepted this argument that Decedent was deprived of the opportunity to have one thousand days of a pain-free life. Appellant's own expert, Dr. Sherry, confirmed that all of the dental treatment to which Decedent was exposed would have been unnecessary had the Appellant been aware of the significance of the bone scan results and communicated the same to Decedent's other treating physicians. The verdict in this case did not shock the conscience of the trial court, and we similarly find no abuse of discretion on the part of the trial court in not having granted a remittitur in this case.

### 5. *Conduct of Counsel—Re: Prejudice*

¶ 21 Appellant's final argument that he was prejudiced by the trial court's

conduct toward his trial counsel is belied by the record, which reveals that, throughout the trial, Appellant's counsel aggressively attempted to shift blame for Decedent's condition to other treating physicians, even though none of them had been joined as additional defendants by Appellant, and several of them had, in fact, actually testified on Appellant's behalf. Despite the trial court's "off-the-record" admonition to Appellant's counsel that this argument was inappropriate because of the non-joinder of other physicians as defendants, Appellant's counsel, nevertheless, persisted and continued to pursue that tact.[8] Appellant's counsel also attempted, in a veiled manner, to appeal to parochialism by referring to the fact that Appellant's expert witness (Dr. Sanford) was from Alabama. At various stages of the trial, the trial court admonished counsel to adhere to relevant testimony and appropriate argument. Nevertheless, Appellant's counsel persisted with these inappropriate attacks.[9] Consistent

8. The trial court, in its Memorandum of June 22, 2006, described Appellant's counsel's behavior in that regard as follows:

> Counsel for **Gbur**, in his Brief in Opposition to the Post–Trial Motion, has attached an Appendix wherein he recites at length the multiple times that counsel for **Golio** attempted to place blame on other Doctors, notwithstanding my rulings on this tactic.... As a result of the repeated use of this tactic, despite my rulings, when it resurfaced in Counsel's closing, I was compelled to limit him again, and explain to the jury that they should disregard that argument.... Undaunted, however, within a few lines he says **Plaintiff's** expert has criticized **Golio**, but said nothing about Onufrey and Abarbanel. He then adds "we're saying why is Dr. Golio negligent, and these guys aren't negligent ... We're not saying that they are negligent? We're saying why us and not them?" ...
>
> This onslaught finally drew an objection from **Gbur's** counsel, and I said, "Get off that issue. It's a straw man. Go ahead.

How much longer are we going to be? You've been at it an hour." (**Trial Court Memorandum, pp. 15–17, N.T. references omitted**).

9. In that regard, the trial court's Memorandum of June 22, 2006 observed the following:

> Counsel then shifted his attack to a parochial assault on Dr. Sanford and called the jurors attention to the fact that he was from Alabama.... When defense counsel attempted to refer to Sanford's report, which was not in evidence, counsel objected, and at sidebar. I admonished defense counsel for his thinly veiled appeal to parochial prejudice....
>
> Continuing with his paean of parochialism, defense asks, "Why is it that the Plaintiffs could not find a urologist in the country to support their claims?" ... As noted, after reference to not finding a urologist anywhere in the Country, I deemed it appropriate to give the curative instruction requested by Plaintiff's counsel and said

with the trial court's duty and obligation to control the proceedings in the court-room and to assure that the jury was presented with only legally relevant and germane testimony and arguments of counsel, the trial court below appropriately exercised its discretion in informing the jury of the inappropriateness of Appellant's counsel's misleading suggestions and improper argument. *See DeFulvio v. Holst,* 239 Pa.Super. 66, 362 A.2d 1098, 1099 (1976), and *Commonwealth v. Goosby,* 450 Pa. 609, 611, 301 A.2d 673, 674 (1973). Thus, we find no merit to Appellant's claim of prejudice toward his trial counsel.

¶ 22 Judgment affirmed.

that it is irrelevant where a witness came from. **(Trial Court Memorandum, pp. 17–18, N.T. references omitted).**