J-A06016-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| LATOYA TAYLOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| v. | : | |
| | : | |
| TENET, INC., T/A HAHNEMANN | : | |
| UNIVERSITY HOSPITAL AND RYAN K. | : | |
| BRANNON, M.D. | : | |
| | : | |
| Appellees | : | No. 3013 EDA 2018 |

Appeal from the Judgment Entered September 10, 2018
In the Court of Common Pleas of Philadelphia County
Civil Division at No(s): November Term, 2015 No. 003930

BEFORE:   STABILE, J., KING, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY KING, J.:                    **FILED MAY 13, 2020**

Appellant, LaToya Taylor, appeals from the judgment entered in the Philadelphia County Court of Common Pleas, in favor of Appellees Tenet, Inc., t/a Hahnemann University Hospital ("Hahnemann") and Ryan K. Brannon, M.D. ("Dr. Brannon"), in this medical malpractice action.  We affirm.

In its opinion, the trial court sets forth the relevant facts and most of the procedural history of this case as follows:

### FACTUAL HISTORY

> Nineteen-year-old [Appellant] was near the end of her pregnancy in November 2013.  Her weight status was classified as obese, which put her at an increased risk of post-surgical infection and morbidity.  Her obstetric healthcare providers decided to induce labor at forty weeks

_____

[*] Former Justice specially assigned to the Superior Court.

due to her weight. She went to Hahnemann Hospital for the induction on November 28, 2013. The induction was successful, but [Appellant] experienced an arrest of labor.[1] At that point, after approximately twenty-one or twenty-two hours of labor, the hospital team decided to perform a Caesarean section. [Appellee] Dr. Brannon was the on-call obstetrician who performed the C-section, and by all accounts it went smoothly.

[1] An arrest of labor occurs when the cervix stops dilating prematurely, thereby preventing vaginal delivery.

[Appellant] recovered in the hospital from November 30 to December 2, and she felt mostly fine during that period. She went home on December 2 but began feeling unwell that night. On December 3, her symptoms had worsened, with extreme chills and [she] had a fever of [101] degrees. At discharge, she had been given pain medications and instructed to watch for chills, fever, drainage in the incision area, and fluid discharge that had color or odor, as any of those symptoms could be signs of infection. In accordance with these instructions, she called the Hahnemann labor and delivery department and spoke with the on-call resident about her symptoms. The resident told her to continue taking ibuprofen and did not instruct her to come to the hospital or seek any other medical attention.

She continued to experience chills the next day, December 4, and her temperature had increased to [102] degrees. She called Hahnemann again and was told to continue taking ibuprofen, and that her next scheduled appointment would be coming up soon. The next day, December 5, she noticed an odor coming from the incision site that smelled "like garbage" and seemed to be consistent or worsening over time. Furthermore, she began to see brownish-colored fluid on the drainage pad for her wound. She called Hahnemann a third time and was instructed to come in to the labor and delivery department.

She went to Hahnemann the next day, December 5, and was given a triage evaluation by an unidentified female doctor. By this date, six days had passed since her surgery. Dr. Brannon testified at trial that, on this date, she was in

the early stages of the window in which a post-surgical infection was likely to manifest: "[O]n post-op day five the risk of infection starts to increase. With each passing day the risk starts to increase." The doctor examined the incision, cleaned it with saline, and placed a pad over it to absorb the drainage. Dr. Brannon then came in and introduced himself. [Appellant] heard him discussing with the examining doctor whether or not to admit her and administer intravenous antibiotics, or to send her home with the highest possible dose of non-IV antibiotics. At trial, [Appellant] argued that the only proper course of action under the standard of care was to admit her and treat her with IV antibiotics; however, Dr. Brannon decided to discharge her with antibiotics instead. He did not examine her wound personally, but he arranged to have her next appointment moved up to December 9. He instructed her to call if she did not see an improvement with the antibiotics. [Appellant] and her mother went home, and [Appellant] took a dose of the antibiotics. [Appellant's] mother testified that she noticed a small, red, bruise-like mark on her daughter's stomach, but she assumed it had been caused by the doctor poking her daughter during the triage examination. She testified her daughter was unable to sleep that night due to the odor and pain.

There was no change in [Appellant's] status on December 6, with the continuing odor, brownish fluid discharge, pain, and chills, so [Appellant's] mother called Hahnemann again. She explained that she had waited twenty-four hours for the antibiotic to work, but she was simply told again that her daughter had another appointment soon.

On December 7, [Appellant's] mother noticed that the small red spot had turned black and was growing "into a big black dot," and the smell was foul. In a panic, [Appellant's] mother called Hahnemann and spoke to the on-call resident. She offered to send him a cell phone picture of the area, but he declined. [Appellant's] mother testified that she frantically called Hahnemann numerous times on December 7 at night and the next morning, since [Appellant] was unable to sleep. [Appellant's] mother testified that, [on] the morning of December 8, the black spot had begun to ooze and skin was "coming off." She decided to take [Appellant] to the Temple Hospital emergency room since the

- 3 -

Hahnemann staff did not seem to be giving her serious consideration and she "felt like [Hahnemann staff] was pushing [her] away" instead of helping.

[Appellant] then went to Temple Hospital on December 8 and was examined in their labor and delivery department. She was diagnosed with a deep tissue wound infection with necrotic (dead and dying) tissue and cellulitis/inflammation of the anterior abdominal wall. She underwent an emergency debridement procedure with irrigation and lavage to remove all the dead and infected tissue, and clean out the wound. The post-operation report noted that a "copious amount of purulent fluid was drained." The pathology analysis of the removed tissues showed that [Appellant's] white blood cell count had been 24.6 which [Appellant's] expert characterized as "indicative of…[v]ery significant infection," and furthermore it was determined that the infection had spread beyond the C-section site to surrounding tissues. [Appellant] recovered in the hospital again and was discharged on December 12.

Afterward, [Appellant] was required to use a "wound vac" on the surgical site for approximately five weeks after discharge to collect fluid drainage and sloughed-off tissue from the wound. During that time, she had multiple visits to the ER for trouble with the wound vac. Her wound eventually closed around February, and her symptoms resolved. However, she had experienced depression during this period that continued for months to a year, and that was seemingly influenced by this episode of wound infection. She was also left with an abdominal scar which, [Appellant's] expert testified, was larger or otherwise more noticeable than the scar that would have been left by her C-section alone.

At trial, [Appellant] alleged that Dr. Brannon had been negligent in failing to admit [Appellant] to [Hahnemann] for IV antibiotics on December 5, in choosing the "wrong" antibiotic, failing to obtain an infectious disease consult, and for diagnosing the infection as superficial on December 5 when a deeper infection was indicated in light of [Appellant's] high-risk status for infection. Originally, [Appellant] had sued Hahnemann Hospital and its affiliated entities [under the theory of vicarious liability] for the

- 4 -

alleged negligence of its staff, and specifically the OB/GYN residents who took [Appellant] and her mother's numerous phone calls but did not recognize her symptoms as indicating a serious infection.

Shortly before the start of trial, [Hahnemann] settled with [Appellant].[1]   The parties then argued extensively at motions *in limine* and at various times during trial about whether Hahnemann would properly be included on the verdict slip despite the settlement.  The [c]ourt agreed with [Appellee] Dr. Brannon that sufficient evidence of the [Hahnemann OB/GYN] residents' negligence was presented at trial to permit a jury to find Hahnemann liable, so Hahnemann remained on the verdict slip….   However, Hahnemann did not participate at trial or offer any defense, as its counsel asked to be excused from trial during the hearing for motions *in limine*.

(Trial Court Opinion, filed June 3, 2019, at 1-5) (internal citations omitted).

The court held a jury trial from May 14, 2018, to May 17, 2018.  During direct examination of Appellant's expert medical witness, Dr. Marlan Schwartz, Appellee Dr. Brannon made a series of objections to Dr. Schwartz's testimony as outside the scope of his expert report.  The court and counsel discussed the objections at sidebar.  During the sidebar, Dr. Brannon suggested that any testimony related to Dr. Schwartz's opinion that Appellant should have received IV antibiotics in the hospital was also outside the scope of his expert report.  The following exchange occurred:

THE COURT: All right.  [Appellant's counsel], I don't see where Dr. Schwartz opines that your client should have been hospitalized.

---

[1] Neither the trial court docket sheet nor the certified record references or contains the settlement agreement between Appellant and Hahnemann.

[APPELLANT'S COUNSEL]: Your Honor, the culture done, the preliminary report reports a need for antibiotic dosage regimes that use maximum recommended doses and prolonged —

[DR. BRANNON'S COUNSEL]: Possibly.

[APPELLANT'S COUNSEL]: — intravenous infusion regimes, okay.  And I submit to you that he is offering that opinion that this particular individual should have been admitted to the hospital and treated at that time with IV antibiotics.  Now again I have to say —

THE COURT: I don't see hospital there.  It does say prolonged intravenous infusion.

[APPELLANT'S COUNSEL]: The only place where that could be carried out would be in the hospital, Your Honor.

THE COURT: Well, I don't know that that means inpatient.  I mean you can bring this out.

[DR. BRANNON'S COUNSEL]: If I may on that one, Your Honor.

THE COURT: Excuse me.

[DR. BRANNON'S COUNSEL]: I'm sorry.

THE COURT: You may bring that out to know that that's what he says, but to me that doesn't necessarily mean inpatient.

[DR. BRANNON'S COUNSEL]: If I may, Your Honor, that is not Dr. Schwartz's opinion.  That's Dr. Schwartz quoting a document in this case.  That's Dr. Schwartz quoting a pathology report.  That was not made public until December 7th.  That's not his opinion in this case.

THE COURT: Well, he may bring that out.  You may cross-examine Dr. Schwartz on it.

(N.T. Trial, 5/15/18, at 49-51).

At another point in Dr. Schwartz's direct examination, the court struck one of Dr. Schwartz's answers, which included testimony concerning the use of IV antibiotics, as outside the scope of his expert report:

[APPELLANT'S COUNSEL]: And do you have an opinion within a reasonable degree of medical certainty as to whether or not it was below the standard of care for Dr. Brannon to have prescribed Bactrim for the treatment of this particular patient?

[DR. SCHWARTZ]: Yes, I believe that was not the standard of care antibiotic for this particular patient.

[APPELLANT'S COUNSEL]: Would you explain—first would you tell the jury what the appropriate antibiotics would be.

[DR. SCHWARTZ]: When you have a more intensive infection developing with a wound infection, and especially in someone who is obese, you need to get enough in the blood system absorbed and to the far part of the body where the infection is in adequate levels. So ideally in this situation certainly IV antibiotics at least to get an initial loading dose for 24 hours would be advantageous and advised.

If I was putting someone on outpatient therapy for this, while not ideal, I would probably use something like Levaquin or Duricef which are a little stronger I think for this type of thing, and plus I may add even Clindamycin or Flagyl which gets some of the other coverage in the wound infection because this is brewing and she's at high risk to have this progress.

[DR. BRANNON'S COUNSEL]: Objection. Move to strike, Your Honor. Outside the scope of his report.

THE COURT: Sustained.

[DR. BRANNON'S COUNSEL]: Thank you, Your Honor. Move to strike.

THE COURT: The last answer is stricken.

(*Id.* at 63-64).

Finally, Dr. Schwartz again testified about the use of IV antibiotics in relation to whether Dr. Brannon suspected Appellant of having MRSA at the time of her December 5th visit to Hahnemann:

> [APPELLANT'S COUNSEL]: Doctor, in your opinion with reasonable medical certainty, if the suspicion of MRSA existed, what would it be the standard for [Appellee Dr. Brannon] to have done?
>
> [DR. BRANNON'S COUNSEL]: Objection.
>
> THE COURT: Overruled.
>
> [DR. SCHWARTZ]: At the least I'd like an infectious disease consult and I would start IV antibiotics.
>
> [DR. BRANNON'S COUNSEL]: Objection again to what he would do.
>
> THE COURT: That's sustained.
>
> [APPELLANT'S COUNSEL]: I'm sorry?
>
> THE COURT: It's sustained as to what this doctor would do.
>
> [APPELLANT'S COUNSEL]: Doctor, question, so what I'm asking you is not what you would do, but what your opinion as to the standard of care would require Dr. Brannon to do.
>
> [DR. SCHWARTZ]: The standard of care would entail IV antibiotics and an infectious disease consult.

(*Id.* at 71-72).

Following the conclusion of trial on May 17, 2018, the jury returned a verdict in favor of Dr. Brannon and Hahnemann. Appellant timely filed a post-trial motion for a new trial on Tuesday, May 29, 2018 (Monday, May 28, 2018

was Memorial Day), and a supplemental post-trial motion on July 16, 2018. The court denied Appellant's post-trial motion on September 5, 2018. On September 10, 2018, Dr. Brannon filed a *praecipe* to enter judgment on the verdict, and the court entered judgment that same day. On September 28, 2018, Appellant filed a timely notice of appeal. The court ordered Appellant on October 2, 2018, to file a concise statement of errors complained of on appeal, pursuant to Pa.R.A.P. 1925(b); Appellant timely complied on October 19, 2018.

Appellant raises the following issues for our review:

> DID THE TRIAL COURT COMMIT ERROR OF LAW AND/OR ABUSE OF DISCRETION WHEN IT DENIED THE MOTION TO DISMISS [HAHNEMANN] WHEN THERE WAS NO CROSS-CLAIM BY…APPELLEE [DR. BRANNON] AGAINST [HAHNEMANN]?

> DID THE TRIAL COURT COMMIT ERROR OF LAW AND/OR ABUSE OF DISCRETION WHEN IT PLACED [HAHNEMANN] ON THE VERDICT SHEET WHEN THERE WAS NO EXPERT TESTIMONY TO ESTABLISH A *PRIMA FACIE* CASE AGAINST [HAHNEMANN] BECAUSE OF AN ABSENCE OF EXPERT TESTIMONY AND THE FACT THAT *RES IPSA* [*LOQUITUR*] DID NOT APPLY BECAUSE OF THE COMPLEX MEDICAL ISSUES, WHICH WERE OUTSIDE THE COMMON KNOWLEDGE OF A LAYPERSON[?]

> DID THE TRIAL COURT COMMIT ERROR OF LAW AND/OR ABUSE OF DISCRETION WHEN IT PRECLUDED APPELLANT FROM QUESTIONING HER MEDICAL EXPERT ON DIRECT AS TO HIS OPINIONS THAT APPELLANT SHOULD HAVE RECEIVED IV ANTIBIOTICS IN A HOSPITAL SETTING WHEN APPELLEE [DR. BRANNON]'S EXPERT CRITICIZED THAT OPINION IN HIS OWN EXPERT REPORT?

(Appellant's Brief at 2).

A trial court's denial of a motion for a new trial implicates the following principles:

> "[A]bsent a clear abuse of discretion by the trial court, appellate courts must not interfere with the trial court's authority to grant or deny a new trial." ***Harman ex rel. Harman v. Borah***, 562 Pa. 455, 466, 756 A.2d 1116, 1121-22 (2000).
>
> > In ***Harman***, the Court noted that the trial court must follow a two-step process in responding to a request for a new trial. The trial court must determine whether a factual, legal or discretionary mistake was made at trial. If the trial court determines that one or more mistakes were made, it must then evaluate whether the mistake provided a sufficient basis for granting a new trial. Moreover, the Court noted[:] "A new trial is not warranted merely because some irregularity occurred during the trial or another trial judge would have ruled differently; the moving party must demonstrate to the trial court that he or she has suffered prejudice from the mistake."
> >
> > The Court then set forth an additional two-step analysis for appellate review of a trial court's determination to grant or deny[9] a new trial. First, the appellate court must examine the decision of the trial court to determine whether it agrees that a mistake was, or was not, made. In so doing, the Court noted that the appellate court must apply the appropriate standard of review. If the alleged mistake involved an error of law, the appellate court must scrutinize for legal error. If the alleged mistake at trial involved a discretionary act, the appellate court must review for an abuse of discretion. The Court reiterated that a trial court abuses its discretion by rendering a judgment that is manifestly unreasonable, arbitrary or capricious, or has failed to apply the law, or was motivated by partiality, prejudice, bias or ill will.
> >
> > > [9] The Court specifically held that a review of a denial of a new trial requires the same analysis as a review of a grant of a new trial.

- 10 -

If the appellate court agrees with the trial court's determination that there were no prejudicial mistakes at trial, then a decision by the trial court to deny a new trial must stand and we need not reach the second prong of the analysis. If the appellate court discerns that a mistake was made at trial, however, it must analyze whether the trial court abused its discretion in ruling on the motion for a new trial.

*Ettinger v. Triangle-Pacific Corp.*, 799 A.2d 95, 106 (Pa.Super. 2002), *appeal denied*, 572 Pa. 742, 815 A.2d 1042 (2003) (internal citations omitted). We will overturn the decision only where the trial court abused its discretion or committed an error of law that controlled the outcome of the case. We view the evidence in the light most favorable to the verdict winner to determine whether a new trial would produce a different verdict. Consequently, if there is any support in the record for the trial court's decision to deny a new trial, that decision must be affirmed. Further, a new trial is granted only where the verdict is so contrary to the evidence as to shock one's sense of justice, not where the evidence is conflicting or where the court might have reached a different conclusion on the same facts.

*MacNutt v. Temple University Hosp., Inc.*, 932 A.2d 980, 985 (Pa.Super. 2007) (*en banc*), *appeal denied*, 596 Pa. 708, 940 A.2d 365 (2007) (some internal citations and quotation marks omitted).

After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinion of the Honorable Rosalyn K. Robinson, we conclude Appellant's first and second issues on appeal merit no relief. The trial court opinion comprehensively discusses and properly disposes of those questions. (**See** Trial Court Opinion, filed June 3, 2019, at 7-10) (finding: Appellant conceded report of her expert, Dr. Marlan Schwartz, criticized Hahnemann OB/GYN residents who spoke with Appellant and her

- 11 -

mother various times about Appellant's infection; during pre-trial motion hearing, Dr. Brannon also stated he intended to elicit testimony from Dr. Schwartz regarding wrongdoing on part of Hahnemann OB/GYN residents; thus, court issued pre-trial ruling denying motion to dismiss Hahnemann from case, because evidence against Hahnemann appeared to be forthcoming; at trial, Appellant and her mother testified that although they called Hahnemann several times regarding worsening condition of Appellant's infection, Hahnemann OB/GYN residents did not investigate whether Appellant was developing systemic infection; Appellant's expert added testimony that Hahnemann OB/GYN residents should have, but did not, treat as significant concern evolving symptoms of infection that Appellant reported in phone calls; even without expert testimony that infection warranted investigation, it is within realm of lay jurors to understand Hahnemann OB/GYN residents were not concerned by Appellant's worsening condition enough to investigate or recommend medical intervention, despite numerous phone calls from Appellant and her mother; Pennsylvania law permits settling defendant to remain on verdict sheet, even after entering joint-tortfeasor release with plaintiff, where there is sufficient evidence to find defendant liable; jury had sufficient evidentiary basis to find Hahnemann vicariously liable for negligence of its residents; thus, court did not err when it retained Hahnemann on verdict sheet, despite settlement agreement with Appellant and absence of cross-claim by Dr. Brannon; moreover, jury expressly found Dr. Brannon not

negligent in response to question #1 on verdict sheet; jury then proceeded to question #2, and found Hahnemann not negligent; verdict shows jury found Dr. Brannon not negligent, regardless of jury's consideration of Hahnemann's liability; thus, even if court erred when it retained Hahnemann on verdict sheet, Appellant suffered no prejudice). The record makes clear Appellant suffered no prejudice from the court's inclusion of Hahnemann on the verdict sheet to warrant a new trial. **See MacNutt, supra**. Accordingly, with respect to Appellant's first and second issues on appeal, we affirm based on the trial court's opinion.

In her remaining issue, Appellant contends the trial court erred when it excluded, on direct examination, Dr. Schwartz's opinion that Appellant should have received IV antibiotics in a hospital setting on her December 5th visit to Hahnemann. Appellant asserts Dr. Brannon could not claim surprise or lack of notice, or contend that Dr. Schwartz's testimony was outside the scope of his expert report, because Dr. Brannon's expert, Dr. Robert Dein, criticized Dr. Schwartz's opinion concerning IV antibiotics in both his expert report and trial testimony. Appellant maintains the court's decision to exclude Dr. Schwartz's testimony deprived her of the opportunity to rebut Dr. Brannon's expert's testimony and prevented her from offering an opposing position on the proper standard of care. Appellant concludes this Court should reverse the trial court's decision to deny Appellant's motion for post-trial relief and remand for a new trial. We disagree.

Admission of expert testimony is within the sound discretion of the trial court and will not be disturbed absent a manifest abuse of discretion. ***Brady v. Ballay, Thornton, Maloney Medical Associates, Inc.***, 704 A.2d 1076 (Pa.Super. 1997), *appeal denied*, 555 Pa. 738, 725 A.2d 1217 (1998) (citing ***Walsh v. Kubiak***, 661 A.2d 416 (Pa.Super. 1995) (*en banc*), *appeal denied*, 543 Pa. 716, 672 A.2d 309 (1996)). The Pennsylvania Rules of Civil Procedure require that an expert's testimony at trial be limited to the "fair scope" of his pre-trial report:

> To the extent that the facts known or opinions held by an expert have been developed in discovery proceedings under subdivision (a)(1) or (2) of this rule, the direct testimony of the expert at the trial may not be inconsistent with or go beyond the fair scope of his or her testimony in the discovery proceedings as set forth in the deposition, answer to interrogatory, separate report, or supplement thereto. However, the expert shall not be prevented from testifying as to facts or opinions on matters on which the expert has not been interrogated in the discovery proceedings.

Pa.R.C.P. 4003.5(c).

This Court has explained:

> [I]t is impossible to formulate a hard and fast rule for determining when a particular expert's testimony exceeds the fair scope of his or her pretrial report. Rather, the determination must be made with reference to the particular facts and circumstances of each case. The controlling principle which must guide is whether the purpose of Rule 4003.5 is being served. The purpose of requiring a party to disclose, at his adversary's request, "the substance of the facts and opinions to which the expert is expected to testify" is to avoid unfair surprise by enabling the adversary to prepare a response to the expert testimony. In other words, in deciding whether an expert's trial testimony is within the fair scope of his report, the accent is on the word "fair." The

- 14 -

question to be answered is whether, under the particular facts and circumstances of the case, the discrepancy between the expert's pretrial report and his trial testimony is of a nature which would prevent the adversary from preparing a meaningful response, or which would mislead the adversary as to the nature of the appropriate response.

***Nazarak v. White***, 216 A.3d 1093, 1106-07 (Pa.Super. 2019) (citing ***Hassel v. Franzi***, 207 A.3d 939, 951 (Pa.Super. 2019), *appeal denied*, ___ Pa. ___, 218 A.3d 862 (2019)).

Instantly, the record belies Appellant's claim that the court prohibited her from eliciting expert testimony from Dr. Schwartz on direct examination concerning the use of IV antibiotics. Following several objections from Dr. Brannon that Dr. Schwartz's testimony was outside the scope of his expert report, Appellant's counsel requested a sidebar. During this conversation, the court overruled Dr. Brannon's objections and decided Dr. Schwartz could address whether Appellant should have received IV antibiotics in the hospital, stating: "Well, he may bring that out." (N.T. Trial, 5/15/18, at 51).

On direct examination, Dr. Schwartz initially testified regarding the use of IV antibiotics as follows:

> [APPELLANT'S COUNSEL]: Would you explain—first would you tell the jury what the appropriate antibiotics would be.
>
> [DR. SCHWARTZ]: When you have a more intensive infection developing with a wound infection, and especially in someone who is obese, you need to get enough in the blood system absorbed and to the far part of the body where the infection is in adequate levels. So ideally in this situation certainly IV antibiotics at least to get an initial loading dose for 24 hours would be advantageous and advised.

- 15 -

If I was putting someone on outpatient therapy for this, while not ideal, I would probably use something like Levaquin or Duricef which are a little stronger I think for this type of thing, and plus I may add even Clindamycin or Flagyl which gets some of the other coverage in the wound infection because this is brewing and she's at high risk to have this progress.

[DR. BRANNON'S COUNSEL]: Objection. Move to strike, Your Honor. Outside the scope of his report.

THE COURT: Sustained.

[DR. BRANNON'S COUNSEL]: Thank you, Your Honor. Move to strike.

THE COURT: The last answer is stricken.

(*Id.* at 63-64). Although the court struck Dr. Schwartz's response, it is unclear whether the court's decision to strike was based on Dr. Schwartz's discussion of IV antibiotics or his discussion of several medications not mentioned in his expert report, or both. Appellant, however, did not challenge the objection that the testimony was "[o]utside the scope of his report."

In any event, during later examination, the court permitted Dr. Schwartz's reference to IV antibiotics. In this instance, Dr. Schwartz testified that "[t]he standard of care would entail IV antibiotics and an infectious disease consult" if Dr. Brannon had suspected Appellant of having MRSA at the time of her December 5th visit to Hahnemann. (N.T. Trial, 5/15/18, at 72). Therefore, contrary to Appellant's allegations, the court did not prohibit Dr. Schwartz from testifying to the use of IV antibiotics. Rather, the record demonstrates the trial court granted Appellant the latitude to question Dr.

Schwartz about the general use of IV antibiotics. After the court struck Dr. Schwartz's initial testimony concerning IV antibiotics, Appellant failed to rephrase his question, attempt to narrow the scope of the question, seek clarification from the court regarding the scope of the precluded testimony, or challenge Dr. Brannon's objection. Instead, Appellant simply abandoned this line of questioning. Thus, Appellant's argument that the court improperly excluded Dr. Schwartz's testimony is belied by the record and merits no relief. Accordingly, we affirm.

Judgment affirmed.

President Judge Emeritus Stevens joins this memorandum.

Judge Stabile concurs in the result.

*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*

*Date: 5/13/2020*

## IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
## FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
## TRIAL DIVISION – CIVIL SECTION

LATOYA TAYLOR,                           :
                                         :
            Plaintiff,                   :        3013 EDA 2018
                                         :
      v.                                 :        Trial Court Docket No. 151103930
                                         :
TENET, INC., T/A HAHNEMANN UNIVERSITY :
HOSPITAL and RYAN K. BRANNON, M.D.,      :
                                         :
            Defendants.                  :

### OPINION PURSUANT TO PA. R.A.P. 1925(A)

**ROBINSON, J.**                                          **JUNE 3, 2019**

This appeal stems from a medical malpractice action. Plaintiff, LaToya Taylor, sued Defendants Hahnemann University Hospital and Dr. Ryan Brannon for failure to timely diagnose and properly treat an infection she developed following a Caesarean section procedure. At trial, the jury found that neither of the defendants had been negligent. Plaintiff appealed. For the following reasons, we respectfully request the Superior Court affirm.

### FACTUAL HISTORY

Nineteen-year-old Plaintiff, LaToya Taylor, was near the end of her pregnancy in November 2013. Her weight status was classified as obese, which put her at an increased risk of post-surgical infection and morbidity. (N.T. 5/15/18 a.m. at 35-36.) Her obstetric healthcare providers decided to induce labor at forty weeks due to her weight. (N.T. 5/15/18 p.m. at 75.) She went to Hahnemann Hospital for the induction on November 28, 2013. The induction was

1

Taylor Vs Tenet, Inc. Etal-OPFLD



15110393000110

successful, but Ms. Taylor experienced an arrest of labor.[1] At that point, after approximately twenty-one or twenty-two hours of labor, the hospital team decided to perform a Caesarean section. Defendant Dr. Brannon was the on-call obstetrician who performed the C-section, and by all accounts it went smoothly. (N.T. 5/14/18 a.m. at 87-88.)

Plaintiff recovered in the hospital from November 30 to December 2, and she felt mostly fine during that period. (N.T. 5/15/18 p.m. at 78-80.) She went home on December 2 but began feeling unwell that night. On December 3, her symptoms had worsened, with extreme chills and had a fever of one hundred one degrees. (Id. at 82-84.) At discharge, she had been given pain medications and instructed to watch for chills, fever, drainage in the incision area, and fluid discharge that had color or odor, as any of those symptoms could be signs of infection. (N.T. 5/14/18 a.m. at 91-92.) In accordance with these instructions, she called the Hahnemann labor and delivery department and spoke with the on-call resident about her symptoms. (N.T. 5/15/18 p.m. at 84.) The resident told her to continue taking ibuprofen and did not instruct her to come to the hospital or seek any other medical attention. (Id. at 84-85.)

She continued to experience chills the next day, December 4, and her temperature had increased to one hundred two degrees. She called Hahnemann again and was told to continue taking ibuprofen, and that her next scheduled appointment would be coming up soon. (Id. at 87.) The next day, December 5, she noticed an odor coming from the incision site that smelled "like garbage" and seemed to be consistent or worsening over time. (Id. at 89.) Furthermore, she began to see brownish-colored fluid on the drainage pad for her wound. (Id. at 90-91.) She called Hahnemann a third time and was instructed to come in to the labor and delivery department.

---

[1] An arrest of labor occurs when the cervix stops dilating prematurely, thereby preventing vaginal delivery. (N.T. 5/14/18 a.m. at 88.)

2

She went to Hahnemann the next day, December 5, and was given a triage evaluation by an unidentified female doctor. By this date, six days had passed since her surgery. Dr. Brannon testified at trial that, on this date, she was in the early stages of the window in which a post-surgical infection was likely to manifest: "[O]n post-op day five the risk of infection starts to increase. With each passing day the risk starts to increase." (N.T. 5/14/18 a.m. at 93.) The doctor examined the incision, cleaned it with saline, and placed a pad over it to absorb the drainage. (N.R. 5/15/18 p.m. at 96-97.) Dr. Brannon then came in and introduced himself. Plaintiff heard him discussing with the examining doctor whether or not to admit her and administer intravenous antibiotics, or to send her home with the highest possible dose of non-IV antibiotics. (Id. at 100.) At trial, Plaintiff argued that the only proper course of action under the standard of care was to admit her and treat her with IV antibiotics; however, Dr. Brannon decided to discharge her with antibiotics instead. (Id. at 101.) He did not examine her wound personally, but he arranged to have her next appointment moved up to December 9. He instructed her to call if she did not see an improvement with the antibiotics. (Id.) Plaintiff and her mother went home, and Plaintiff took a dose of the antibiotic. Plaintiff's mother testified that she noticed a small, red, bruise-like mark on her daughter's stomach, but she assumed it had been caused by the doctor poking her during the triage examination. (N.T. 5/15/18 p.m. at 28.) She testified her daughter was unable to sleep that night due to the odor and pain. (Id.)

There was no change in Plaintiff's status on December 6, with the continuing odor, brownish fluid discharge, pain, and chills, so Plaintiff's mother called Hahnemann again. She explained that she had waited twenty-four hours for the antibiotic to work, but she was simply told again that her daughter had another appointment soon. (Id. at 30.)

On December 7, Plaintiff's mother noticed that the small red spot had turned black and was growing "into a big black dot," and the smell was foul. In a panic, Plaintiff's mother called

3

Hahnemann and spoke to the on-call resident. She offered to send him a cell phone picture of the area, but he declined. Plaintiff's mother testified that she frantically called Hahnemann numerous times on December 7 at night and the next morning, since Plaintiff was unable to sleep. (Id. at 31-34.) Plaintiff's mother testified that, the morning of December 8, the black spot had begun to ooze and skin was "coming off." She decided to take Plaintiff to the Temple Hospital emergency room since the Hahnemann staff did not seem to be giving her serious consideration and she "felt like [Hahnemann staff] was pushing [her] away" instead of helping. (Id. at 35.)

Plaintiff then went to Temple Hospital on December 8 and was examined in their labor and delivery department. She was diagnosed with a deep tissue wound infection with necrotic (dead and dying) tissue and cellulitis/inflammation of the anterior abdominal wall. (N.T. 5/15/18 a.m. at 74-76.) She underwent an emergency debridement procedure with irrigation and lavage to remove all the dead and infected tissue, and clean out the wound. The post-operation report noted that a "copious amount of purulent fluid was drained." (Id. at 79.) The pathology analysis of the removed tissues showed that Plaintiff's white blood cell count had been 24.6, which Plaintiff's expert characterized as "indicative of...[v]ery significant infection" (id. at 83), and furthermore it was determined that the infection had spread beyond the C-section site to surrounding tissues (id. at 85). Plaintiff recovered in the hospital again and was discharged on December 12. (Id. at 39-40.)

Afterward, Plaintiff was required to use a "wound vac" on the surgical site for approximately five weeks after discharge to collect fluid drainage and sloughed-off tissues from the wound. During that time, she had multiple visits to the ER for trouble with the wound vac. Her wound eventually closed around February, and her symptoms resolved. However, she had experienced depression during this period that continued for months to a year, and that was seemingly influenced by this episode of wound infection. She was also left with an abdominal scar

4

which, Plaintiff's expert testified, was larger or otherwise more noticeable than the scar that would have been left by her C-section alone. (Id. at 42, 45-47, 51-54.)

At trial, Plaintiff alleged that Dr. Brannon had been negligent in failing to admit Plaintiff to the hospital for IV antibiotics on December 5, in choosing the "wrong" antibiotic, failing to obtain an infectious disease consult, and for diagnosing the infection as superficial on December 5 when a deeper infection was indicated in light of Plaintiff's high-risk status for infection. Originally, Plaintiff had sued Hahnemann Hospital and its affiliated entities for the alleged negligence of its staff, and specifically the OB/GYN residents who took Plaintiff and her mother's numerous phone calls but did not recognize her symptoms as indicating a serious infection.

Shortly before the start of trial, the Hahnemann defendants settled with Plaintiff. The parties then argued extensively at motions *in limine* and at various times during trial about whether Hahnemann would properly be included on the verdict slip despite the settlement. The Court agreed with Defendant Dr. Brannon that sufficient evidence of the residents' negligence was presented at trial to permit a jury to find Hahnemann liable, so Hahnemann remained on the verdict slip as discussed more below. However, Hahnemann did not participate at trial or offer any defense, as its counsel asked to be excused from trial during the hearing for motions *in limine*.

**PROCEDURAL HISTORY**

The case was tried before a jury from May 11, 2018, and May 17, 2018. The jury found that neither Dr. Brannon nor the Hospital residents (who were identified on the verdict slip as "Hahnemann University Hospital (OB/GYN residents)") were negligent, so Plaintiff did not recover. Plaintiff timely filed a Post-Trial Motion which the Court eventually denied on September 5, 2018, after several supplemental filings. Plaintiff timely filed a Notice of Appeal on September 28, 2018, and a Rule 1925(b) Statement as ordered on October 18, 2018.

5

Plaintiff raises the following allegations of error:

1. The Court erred when it denied the Motion to Dismiss of Defendant Tenet Health System/Hahnemann Hospital when that Defendant had signed a joint tortfeasor settlement with Plaintiff and was no longer a defendant in the litigation.

2. The Court erred when it denied Hahnemann Hospital's Motion to Dismiss as Defendant Dr. Brannon never filed any cross-claim against Hahnemann Hospital or OB/GYN residents.

3. The Court erred by placing Hahnemann Hospital and OB/GYN Residents on the verdict sheet when Hahnemann Hospital had signed a joint tortfeasor settlement.

4. The Court erred by placing Hahnemann Hospital and OB/GYN Residents on the verdict sheet when Plaintiff had no remaining claims against Hahnemann Hospital.

5. The Court erred by placing Hahnemann Hospital and OB/GYN Residents on the verdict sheet when Defendant Dr. Brannon did not file cross-claims against Hahnemann Hospital and/or OB/GYN Residents in the Answer with New Matter.

6. The Court erred by placing Hahnemann Hospital and OB/GYN Residents on the verdict sheet when Defendant Dr. Brannon never amended the Complaint to file cross-claims against Hahnemann Hospital or OB/GYN Residents prior to or during trial.

7. The Court erred by placing Hahnemann Hospital and OB/GYN Residents on the verdict sheet after Defendant Dr. Brannon testified at trial on May 14, 2018, that he was not contending Hahnemann Hospital and OB/GYN Residents were negligent.

8. The Court erred by placing Hahnemann Hospital and OB/GYN Residents on the verdict sheet when Defendant Dr. Brannon did not offer any expert testimony critical of Hahnemann Hospital and OB/GYN Residents either through his own experts or Plaintiff's experts.

9. The Court erred by placing Hahnemann Hospital and OB/GYN Residents on the verdict sheet when Defendant Dr. Brannon's counsel stated they were going to elicit expert testimony from Plaintiff's expert, Marlan Schwartz M.D., during trial and never did.

10. The Court erred by placing Defendant Hahnemann Hospital and OB/GYN Residents on the verdict sheet because Defendant Dr. Brannon did not produce sufficient evidence to demonstrate that any other person/entity aside from himself was negligent and that negligence was a factual cause of harm suffered by the Plaintiff.

11. The Court erred when it denied Plaintiff's motion *in limine* to preclude defense from questioning Plaintiff's expert Dr. Schwartz on cross-examination about the negligence of OB/GYN Residents.

12. The Court erred when it ruled Plaintiff's expert Dr. Schwartz could not opine on direct examination that Plaintiff should have received IV antibiotics in a hospital setting on December 5, 2013, because that opinion was outside the scope of his expert report even though Defendant's expert Robert Dien M.D. interpreted the report to include such opinions and offered his own opinion on the subject in rebuttal.

13. The Court erred by permitting the jury to consider the negligence of any other settling Defendant when Defendant Dr. Brannon never requested leave of the Court

to amend the Complaint to include cross-claims against Hahnemann Hospital and OB/GYN Residents either before or after the joint tortfeasor settlement.

14. The Court erred by permitting the jury to consider the negligence of any other settling Defendant when Defendant Dr. Brannon had between March 29, 2018, when counsel received notice of the joint tortfeasor settlement, and the eve of trial, nearly a month and a half later, to request leave to amend the complaint and add cross-claims against Hahnemann Hospital and/or OB/GYN Residents.

15. The Court erred by calling the case every morning of trial as "Plaintiff, LaToya Taylor v. Defendant, Ryan K. Brannon, M.D." while leaving settling Defendants Hahnemann Hospital on the caption and then instructing the jury to consider the negligence of parties never mentioned as Defendants to the jury before the time of jury instructions.

16. The Court erred by instructing the jury to consider the negligence of settling Defendants Hahnemann Hospital and OB/GYN Residents when no expert testimony was proffered to support such an instruction, which caused juror confusion on who the Defendant was in this case as demonstrated by the only two questions asked by the jurors to the Court during deliberations.

## DISCUSSION

As a preliminary matter, we note that thirteen of these sixteen claims can essentially be reduced[2] to one single claim of error: that the Court erred in issuing a verdict slip that included "Defendant Hahnemann University Hospital (OB/GYN residents)." The jury's only findings on the verdict slip were as follows:

Question 1: Do you find that Defendant Ryan K. Brannon, M.D., was negligent? *[checked box]* No.

*[Question 2 properly left unanswered]*

Question 3: Do you find that Defendant Hahnemann University Hospital (OB/GYN residents) was negligent? *[checked box]* No.

See verdict slip at 1-2. The jury is presumed to have followed the trial court's instructions, Commonwealth v. Cash, 137 A.3d 1262, 1280 (Pa. 2016) (citation omitted), and as is common practice in this Court, the verdict slip in this case contained specific instructions on how the jury was to proceed numerically through the given questions. We must therefore assume that the jury

---

[2] We endeavor to address every *discrete* allegation of error raised in the Concise Statement, but many of these issues as stated overlap significantly or are outright duplicative.

7

determined that Defendant Dr. Brannon was not negligent (in Question 1) before it considered the question of Defendant Hahnemann's negligence (in Question 3). Therefore, to the extent Plaintiff argues that the inclusion of Defendant Hahnemann somehow diluted, or prevented a finding of, Defendant Dr. Brannon's liability, this claim is meritless. Dr. Brannon was found not negligent even outside the jury's consideration of Hahnemann's liability. Generally speaking, we do not see that the inclusion of Hahnemann could have prejudiced Plaintiff or affected the jury's verdict. See Harman ex rel. Harman v. Borah, 756 A.2d 1116, 1122 (Pa. 2000) (discussing harmless error and the requirement that an appellant demonstrate prejudice to obtain legal relief).

1. **The Court did not err in including Defendant Hahnemann on the verdict slip, as there was sufficient evidence at trial for a jury to find liability. Even if this decision were erroneous, no prejudice resulted, and thus no relief is merited.**

Shortly before trial, Defendant Hahnemann Hospital and its affiliated entities entered into a joint tortfeasor release/settlement with Plaintiff. Defendant Hahnemann's counsel was excused from attending jury selection in this matter, but attended motions *in limine* to move for dismissal of her clients. Plaintiff's counsel supported this motion and averred that he did not intend to elicit any testimony or present any evidence critical of Hahnemann, although he admitted that the report of Plaintiff's expert Dr. Schwartz contained criticisms of the Hahnemann residents who spoke with Plaintiff and her mother at various times. (N.T. 5/14/18 a.m. at 12-15.)

A settling defendant may remain on a verdict slip, even after entering a joint tortfeasor release with the plaintiff, so long as there is sufficient evidence for a jury to find the defendant liable. Herbert v. Parkview Hosp., 854 A.2d 1285, 1289-91 (Pa. Super. Ct. 2004). The settling defendant may be retained on the verdict slip even without a cross-claim by a non-settling co-defendant. Id. at 1290, citing Nat'l Liberty Life Ins. Co. v. Kling P'ship, 504 A.2d 1273 (Pa. Super. Ct. 1986). Therefore, it was proper for Hahnemann to remain on the verdict sheet, despite settling

8

out with Plaintiff, so long as the jury was presented with sufficient evidence to find Hahnemann was liable. The inclusion of Hahnemann would not be proper if there were "a profound lack of evidence" of Hahnemann's negligence. Hyrcza. v. West Penn Allegheny Health Sys., 978 A.2d 961, 969 (Pa. Super. 2009).

When the Motion to Dismiss was presented at trial, counsel for Dr. Brannon stated there would be evidence that there was wrongdoing on the part of employees of Hahnemann. "Specifically, we intend to elicit testimony through Dr. Schwartz, who plaintiff's counsel has just acknowledged he provided expert report that criticized not only Dr. Brannon, but physicians, resident physicians at Hahnemann...." (N.T. 5/14/18 a.m. at 16.) Counsel also stated that there would be testimony from Dr. Brannon "as well as cross-examination of Dr. Schwartz on a credibility issue." (Id. at 20-21.) Since evidence against the settling defendant appeared to be forthcoming, the Court did not err in denying the original dismissal motion when it was made at the start of trial.

At trial, both Plaintiff and her mother gave ample testimony regarding the numerous phone calls they made to the hospital residents to report worsening symptoms of possible infection, and the fact that none of these calls seemed to raise alarm or persuade the residents to investigate whether Plaintiff was developing a systemic infection. Furthermore, Plaintiff's expert added testimony that Plaintiff's evolving symptoms as reported in her phone conversations "should have been treated as significant" but were not. (N.T. 5/15/18 a.m. at 102-103.)

In medical malpractice actions against physicians, expert opinion testimony is needed to make a *prima facie* case to the fact-finder. However, there is an exception: expert testimony is not required when the alleged medical malpractice is so clearly within the experience of a layperson that specialized training or experience is not necessary. See Toogood v. Owen J. Rogal, D.D.S.,

9

P.C., 824 A.2d 1140, 1145 (Pa. 2003). In this case, there was expert testimony that symptoms like discolored fluid drainage and odor were signs of systemic infection, and that the worsening of those symptoms warranted investigation. Even without that testimony, however, the Court believes it is within the realm of a layperson to appreciate that, despite the number of phone calls made to the residents to report the significant worsening of symptoms over time, the residents were not concerned by the changes in patient status enough to even warrant investigation of her condition, let alone to recommend medical intervention for it. Therefore, it would have been proper for Hahnemann to remain on the verdict slip even without the expert evidence; since there is such expert evidence, it is doubly clear that the jury had sufficient evidentiary basis to find that Hahnemann was vicariously liable for the negligence of its residents. The Court did not err in retaining Hahnemann on the verdict slip, despite its settling out with Plaintiff and despite the absence of a cross-claim by the non-settling defendant. See Herbert, 854 A.2d at 1291. Even if that were not the case, however, Plaintiff was not prejudiced by the inclusion of Hahnemann on the verdict sheet, so no legal relief is merited.

2. **The Court did not err in its rulings pertaining to Plaintiff's expert Dr. Marlan Schwartz.**

Plaintiff avers that the Court erred in denying Plaintiff's motion *in limine* to preclude cross-examination of Dr. Schwartz on the issue of the negligence of the OB/GYN residents, and that the Court erred in preventing Dr. Schwartz from offering testimony on the necessity of Plaintiff receiving IV antibiotics in a hospital setting as outside the scope of Dr. Schwartz's report.

a. **Denial of motion *in limine* to preclude cross-examination of Dr. Schwartz regarding negligence of OB/GYN residents**

We have reviewed the record, and we believe that what Plaintiff refers to is, rather than a filed motion *in limine* with argument and citations to legal support, simply an off-the-cuff verbal

10

request that Plaintiff's counsel made of the Court after all the outstanding motions had been ruled upon, and as the Court was transitioning to discussion of housekeeping concerns. (N.T. 5/14/18 a.m. at 26:4-11.) No argument or formal motion had been presented to this Court, though Plaintiff's counsel had already availed himself of the opportunity to file such motions regarding other issues weeks earlier. Furthermore, extensive arguments regarding the scope of Dr. Schwartz's testimony had already been heard; we do not see that counsel had previously made this request to the Court during his earlier arguments, which was clearly the most opportune moment to do so. Counsel had ample opportunity to present a substantive legal argument on this issue, if he had one, to this Court, or to respectfully request the Court hear his argument despite the fact that the discussion of those issues had already closed.

Lastly, we note that Plaintiff did not allege or demonstrate in her Post-Trial Motion that any prejudice was caused by this decision. No relief is warranted on this issue.

### b. Preclusion of cross-examination on opinion regarding IV antibiotics in a hospital setting

Plaintiff avers that the Court erred in precluding cross-examination of Dr. Schwartz on his opinions regarding the negligence of the residents because it was outside the scope of his report, when the opposing expert, Dr. Robert Dien, addressed Dr. Schwartz on that particular point in his own expert report. Counsel argued that, even if the Court found Dr. Schwartz had not specifically opined on that issue, Dr. Dien had apparently interpreted the Schwartz report to include such an opinion. Since Dr. Dien construed the report to contain such an opinion, and Dr. Dien opined on it in response, it could not unfairly surprise Plaintiff to permit exploration of the topic at trial.

The Court expressed the reasoning for its ruling at the time it was rendered, stating that the cross-examination would be excluded because Dr. Dien, in his own report, did not state that Dr.

11

Schwartz's report was among the materials he reviewed or relied on in forming his opinion. (N.T. 5/15/18 a.m. at 52.) [3]

## CONCLUSION

For the reasons, we respectfully request that the Superior Court affirm.

BY THE COURT:

_Rosalyn K. Robinson_

ROBINSON, J.

---

[3] To the extent that any of Plaintiff's non-waived allegations of error (potentially waived for being duplicative) were not addressed in this Opinion, they are omitted here because Plaintiff failed to raise substantive legal arguments in their support either at trial or in her post-trial filings.